SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. Edward Ronald Ates (A-52-12) (070926)**

**Argued February 4, 2014 -- Decided March 18, 2014**

**RABNER, C.J., writing for a unanimous Court.**

In this appeal, the Court considers whether the New Jersey Wiretapping and Electronic Surveillance Control Act (Wiretap Act or Act), N.J.S.A. 2A:156A-1 to -37, is unconstitutional because it allows law enforcement officers in New Jersey to intercept conversations between individuals located outside of New Jersey.

Defendant Edward Ronald Ates, who lived in Florida and had family in Florida and Louisiana, was arrested and charged with the murder of his former son-in-law in Ramsey, New Jersey. As part of the criminal investigation, a New Jersey wiretap judge authorized wiretaps on six telephone numbers assigned to and known to be used by defendant and his family members. The telephone numbers consisted of five cell phones and one landline phone. Law enforcement officers monitored all of the wiretaps from New Jersey. Prior to trial, defendant moved to suppress conversations that involved himself, a Florida resident, his wife, another Florida resident, his mother, a Louisiana resident, and his sister, who lived in both Florida and Louisiana. Defendant claimed that the wiretap orders were "extraterritorial" and that New Jersey officials should have asked the proper authorities in Florida and Louisiana to consent to the wiretaps. Defendant also asserted that the Wiretap Act should be declared unconstitutional because it permits New Jersey authorities to act outside their jurisdiction and wiretap individuals with no connection to New Jersey. The trial court denied the motion, concluding that the Act constitutionally permits intercepting and monitoring out-of-state communications in New Jersey. The jury found defendant guilty.

The Appellate Division affirmed defendant's conviction. State v. Ates, 426 N.J. Super. 521 (App. Div. 2012). The panel rejected defendant's argument about the Act's "extraterritorial" reach and noted that the statute "requires a nexus with New Jersey by insisting that, at the very least, the listening post be located in New Jersey." Id. at 533. The panel observed, "this does not 'usurp [f]ederal authority' because federal law permits the same thing." Ibid. The panel also rejected defendant's other arguments: that the trial court imposed an inadequate remedy for the State's unlawful interception of an attorney-client conversation; that the prosecutor made improper remarks during summation about a defense medical expert; that it was prejudicial error to admit in evidence a reenactment of a drive from New Jersey to Louisiana; and that the cumulative effect of the above errors required reversal. Id. at 531, 534-38. The Court granted defendant's petition for certification. 213 N.J. 389 (2013).

**HELD**: New Jersey's Wiretap Act is constitutional under both the federal and state constitutions. The Legislature's focus on the "point of interception" is a rational approach because the inherent mobility of cell phones would make it impractical, if not impossible in some instances, for law enforcement to intercept cell phone conversations if agents could only rely on orders issued in the state where a call was placed or received.

1. The United States and New Jersey Constitutions' protections against unreasonable searches and seizures extend to the interception of phone conversations. In 1967, the United States Supreme Court issued two landmark opinions that addressed electronic surveillance of phone conversations under the Fourth Amendment and outlined principles to safeguard individual privacy rights in that area. See Berger v. New York, 388 U.S. 41 (1967); Katz v. United States, 389 U.S. 347 (1967). Congress responded the following year by enacting Title III of the Omnibus Crime and Safe Streets Act, 18 U.S.C.A. §§ 2510–2520, which established minimum standards for federal and state law enforcement officials to follow when seeking to intercept wire, oral, and electronic communications. In 1968, the New Jersey Legislature enacted the Wiretap Act and modeled it after Title III. (pp. 15-16)

2. The Wiretap Act empowers the State to apply to a judge for an order authorizing law enforcement officers, who are investigating particular crimes, to intercept wire, electronic, and oral communications. N.J.S.A. 2A:156A-8. Before judges can enter a wiretap order, they must find probable cause to believe (1) that a listed, serious offense under New Jersey law has been, is being, or will be committed; (2) that communications about the criminal activity in New Jersey may be obtained through the interception; and (3) that normal investigative procedures have failed, are unlikely to succeed, or are too dangerous. N.J.S.A. 2A:156A-10a-c. An "intercept" is "the aural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic,

mechanical, or other device." N.J.S.A. 2A:156A-2c. A wiretap order "may be executed at any point of interception within the jurisdiction of an investigative or law enforcement officer executing the order." N.J.S.A. 2A:156A-12h. A "point of interception" is the site where the "officer is located at the time the interception is made" -- commonly referred to as the "listening post." N.J.S.A. 2A:156A-2v. The plain language of the Wiretap Act thus authorizes investigators to intercept out-of-state calls at a listening post in New Jersey. (pp 16-18)

3. Because the State can only prosecute crimes that occur within its territorial borders, the first two findings that a judge must make before issuing a wiretap order connect the interception of communications to activity in New Jersey. See N.J.S.A. 2A:156A-10a-b. In addition, the Act requires that the listening post be located within New Jersey. See N.J.S.A. 2A:156A-12h. Therefore, the Wiretap Act does not unconstitutionally permit the interception of communications with no connection to New Jersey. (pp. 19-20)

4. Because the Wiretap Act is closely modeled after Title III, the Court gives careful consideration to federal decisions interpreting the federal statute. Federal circuit courts have consistently upheld wiretaps based on the location of the listening post, and no circuit court has found Title III unconstitutional on that ground. For example, in United States v. Rodriguez, 968 F.2d 130 (2d Cir.), cert. denied, 506 U.S. 847 (1992), the Second Circuit found that because Title III defines interception as the "aural" acquisition of the contents of the call, and because "aural," by definition, "'pertain[s] to the ear or the sense of hearing,'" the place of interception could be where the police first monitored or listened to the communication. Id. at 136. (citation omitted). The court in Rodriguez also noted that allowing a court where the listening post is located to authorize wiretaps in multiple jurisdictions helps protect individual privacy rights by avoiding unnecessary or unnecessarily long interceptions. Id. (citations omitted). Other federal courts have followed Rodriguez and held that judges can authorize wiretaps when the listening post -- and thus the interception -- is within the court's jurisdiction, even if the phone is located elsewhere. The majority of courts that have interpreted state wiretap laws also agree. For example, in Davis v. State, 43 A.3d 1044 (Md. 2012), Maryland's highest court upheld a wiretap order allowing officials in Maryland to monitor a cell phone located in Virginia, finding that if the listening post is located within the wiretap court's territorial jurisdiction, then "neither the physical location of the mobile phone at the time the call was placed" nor "the recipient of the call are material." Id. at 1048. The Maryland court also noted that a different outcome would present "an enormous logistical and technological challenge to law enforcement" officials if an investigation involved a cell phone that crossed state lines. Id. at 1054. The Court agrees with the many federal and state courts that have allowed judges in the state where the listening post is located to authorize a wiretap. (pp. 20-25)

5. Drawing an analogy to the requirements for searching a home, defendant contends that law enforcement officers must seek a search warrant from a judge in the state where the phones are located. There are obvious differences between searching a fixed location, like a home, and intercepting a phone call on a mobile phone. If out-of-state intercepts could only be authorized by a judge in the jurisdiction where the phones are located, then the inherent mobility of the modern cell phone could defeat even the most responsible efforts to monitor it. In short, defendant's reading of the Act would make it impractical to intercept cell phone conversations. Viewed in that light, the Act's definition of "point of interception" -- the site where an officer is located when an interception is made, N.J.S.A. 2A:156A-2v -- makes rational sense. In addition, defendant's privacy rights were not violated because a New Jersey judge, rather than judges in the states where the phones were located, reviewed his wiretap applications. Defendant's rights would be protected if the applications were reviewed in New Jersey, Florida, or Louisiana because judges in each state must ensure that there is an adequate basis for issuing a wiretap order. At a minimum, the applications would have to meet the requirements of Title III. (pp. 25-27)

6. As to defendant's several other challenges, the Court affirms substantially for the reasons stated in the Appellate Division's opinion. Ates, 426 N.J. Super. at 534-38. (pp. 27-28)

The judgment of the Appellate Division is **AFFIRMED**.

**JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

EDWARD RONALD ATES a/k/a RON
WAVERLY,

    Defendant-Appellant.


        Argued February 4, 2014 – Decided March 18, 2014

        On certification to the Superior Court,
        Appellate Division, whose opinion is
        reported at 426 N.J. Super. 521 (2012).

        Walter A. Lesnevich argued the cause for
        appellant (Lesnevich & Marzano-Lesnevich,
        attorneys; Mr. Lesnevich and Michael R.
        Mildner, on the brief).

        Catherine A. Foddai, Senior Assistant
        Prosecutor, argued the cause for respondent
        (John L. Molinelli, Bergen County
        Prosecutor, attorney).

        Daniel I. Bornstein, Deputy Attorney
        General, argued the cause for amicus curiae
        Attorney General of New Jersey (John J.
        Hoffman, Acting Attorney General, attorney).


    CHIEF JUSTICE RABNER delivered the opinion of the Court.

    In this appeal, defendant Edward Ates challenges the

constitutionality of the New Jersey Wiretapping and Electronic

Surveillance Control Act (Wiretap Act or Act), N.J.S.A. 2A:156A-

1 to -37.  Defendant is serving a life sentence for the murder of his former son-in-law in Ramsey, New Jersey.  During the investigation of the crime, law enforcement officials obtained court orders to intercept communications over various phones.  Among the calls the State intercepted were conversations between speakers located outside of New Jersey, in Louisiana and Florida.  Defendant argues that allowing investigators in New Jersey to intercept conversations between out-of-state parties violated his constitutional rights.

The plain language of the Wiretap Act authorizes officials to execute a wiretap order at any "point of interception" within the investigators' jurisdiction -- the place in New Jersey where officials hear and monitor a conversation for the first time. See N.J.S.A. 2A:156A-12h, -2v.  The Act also requires that a judge find there is probable cause to believe that a serious crime was committed in New Jersey, and that particular communications about that New Jersey offense may be obtained through the interception.  N.J.S.A. 2A:156A-10a-b.  In those ways, the Act requires a direct connection to New Jersey.

Various federal and state court decisions have interpreted similar statutes and upheld them in the face of parallel challenges.  So long as the listening post is within the court's jurisdiction, courts have rejected claims to suppress recorded conversations that took place out-of-state.

2

In connection with defendant's challenge, we find that New Jersey's Wiretap Act is constitutional. We also note that the Legislature's focus on the "point of interception" is a rational approach in the age of cell phones. Because of the inherent mobility of cell phones, it would be impractical, if not impossible in some instances, for law enforcement to intercept cell phone conversations if agents could only rely on orders issued in the state where a call was placed or received. Under that type of scheme, a court order would lose its force as soon as a target crossed state lines with a cell phone in hand.

Both the trial court and Appellate Division rejected defendant's constitutional claim. We agree and affirm. We also affirm the judgment of the Appellate Division as to several other claims defendant raised.

## I.

## A.

We rely on the testimony at defendant's trial for the following facts. On August 23, 2006, Paul Duncsak was fatally shot inside his home in Ramsey. Various circumstances and events led to defendant's arrest for Paul's murder. (For ease of reference, we use first names throughout this opinion.)

Defendant's daughter Stacey married Paul in 1999, and the couple had two children. Paul and Stacey divorced in 2003. As part of a custody dispute, the Family Court granted them joint

custody of the children and named Paul the parent of principal residence. In other words, the children lived with Paul. Under a settlement agreement, Paul kept the family home in Ramsey, and Stacey moved to a condominium.

Paul met Lori Adamo-Gervasi in 2005, and the two became engaged the following year. They decided that Lori would move into Paul's house in Ramsey on August 24, 2006. In the weeks leading up to that date, Paul stayed at Lori's home but stopped by the house in Ramsey each night to check emails and feed his parrot.

Stacey, meanwhile, was unemployed and experienced financial difficulties after the divorce. Stacey's parents, defendant and Dottie Ates, lived in a mobile home in Fort Pierce, Florida. They parked their recreational vehicle on property owned by Evelyn Walker, their other daughter. Evelyn lived in a house on the property, which had a home office, and defendant often used the computers in the office.

In the weeks before Paul's murder, defendant traveled extensively up north. He and Dottie drove from Florida to Pennsylvania in August 2006. On August 14, they checked into a campground for recreational vehicles in Kutztown, Pennsylvania, using the alias "Ron Waverly." They then rented a Dodge Durango in Dottie's name from a nearby car rental agency, with an option to drive to New Jersey. By the next day, they had driven nearly

4

440 miles.  Their travels included a trip to Ramsey where a police officer made note of the Durango during a routine license plate check.  On August 15, they returned the Durango to the rental agency and asked for a car with better gas mileage.  This time, they rented a Hyundai Sonata and again noted that they planned to drive to New Jersey.  They drove almost 1000 miles before returning the car on August 18.

On August 23, the day Paul was murdered, Lori visited the Ramsey house with a close friend to show her where she would soon be living.  Although it was very warm in the house, they did not turn on the air conditioning.  As Lori gave a tour of the house, she noticed certain things that she considered very unusual:  a door to the furnace room, normally kept open for ventilation, was closed; a bathroom door was locked shut; and a Burger King wrapper had been left on the back porch.

Later in the afternoon, a neighbor's son drove past Paul's house and spotted a blue Ford Explorer parked on the apron of the driveway.  At the time, Stacey drove a dark blue Ford Explorer.

Paul called Lori at about 6:20 p.m. to relay that he was driving home to feed the parrot.  Paul and Lori stayed on the phone as he pulled into the driveway and got out of the car. Paul made a comment about the Burger King wrapper and told Lori that she must have left him a present.  Once inside the house,

5

Paul added that Lori had left the air conditioning on. Paul suddenly screamed, "oh, oh no," and then stopped speaking; Lori heard the parrot screech in the background and also heard a thud, "like a falling sound." Lori called Paul's name, but he did not answer. She did not hear any gunfire and dialed 9-1-1.

The police arrived soon after and found Paul's body in a pool of blood. He had been shot at close range at least seven times with bullets fired from a .22 caliber weapon. The police inspected the house to make sure that the shooter was not inside. An officer noticed that the French doors leading from the bedroom to the back deck were unlocked. An examination of the locks on the doors revealed that they had been picked in an aggressive manner.

Hours after the shooting, beginning at around 3:30 a.m., Detective John Haviland tried to contact defendant at his home and cell phone numbers. After an hour, he reached Dottie who told him that defendant was in Louisiana visiting his sick mother, Myra. Defendant left a voicemail message for the Detective at 6:45 p.m. on August 24, and the two spoke later that evening. Defendant said he left Florida on August 20, arrived in Louisiana two days later in the evening, and was at his mother's home, in Sibley, Louisiana, when Paul was killed. Defendant could not document his trip because he claimed he had paid all his expenses in cash, slept in his car, and left his

cell phone behind.  Myra also told the police that defendant had arrived in Louisiana on August 22.

Defendant's sister, Brenda, lived with Myra.  She had not seen her brother at any time from August 20 through 23.  Dottie called Brenda on August 24 and told her that if a strange man were to call and ask, Brenda should say that defendant was in Louisiana on August 22.  Defendant made a similar request.  At first, Brenda confirmed defendant's story, but she eventually admitted to the police that defendant arrived in Louisiana on August 24 and that she had lied when she said he arrived earlier.

Pursuant to a search warrant, law enforcement officers seized and examined computers from Evelyn's home office in Florida.  Forensic tests revealed that someone had used one of the computers to search the Internet for "how to commit the perfect murder."  One article that was accessed suggested using a .22 caliber weapon and an alias while traveling.  Another search turned up articles on how to pick a lock.  Yet another uncovered results about silencers.  The police learned that an order for a lock-picking kit and instruction book had been placed online and shipped to "E. Ates" at defendant's Florida address.  In addition, defendant ordered two books online, from Amazon, under his own name: <u>Workbench Silencers: The Art of Improvised Designs</u> and <u>More Workbench Silencers</u>.

7

B.

At the center of this appeal are certain wiretap orders. In a series of orders entered in September and October 2006, the Honorable Marilyn C. Clark, P.J.S.C., a designated wiretap judge, authorized the interception of telephone communications of defendant, Dottie, Stacey, and others. Specifically, Judge Clark authorized wiretaps on six telephone numbers: (201) 575-xxxx, a cell phone assigned to Stacey; (201) 962-xxxx, a landline phone assigned to Stacey; (772) 519-xxxx, a cell phone registered to Evelyn but known to be used by defendant and Dottie; (201) 248-xxxx, a prepaid cell phone known to be used by defendant and Dottie; (772) 940-xxxx, a prepaid cell phone known to be used by defendant; and (318) 205-xxxx, a cell phone assigned to Brenda and known to be used by Brenda and Myra. Law enforcement officers monitored all of the wiretaps in New Jersey.

C.

On September 28, 2007, a Bergen County Grand Jury indicted defendant and charged him with first-degree murder, N.J.S.A. 2C:11-3a(1) and (2); first-degree felony murder, N.J.S.A. 2C:11-3a(3); second-degree burglary, N.J.S.A. 2C:18-2; second-degree possession of a weapon, a .22 caliber firearm, for an unlawful purpose, N.J.S.A. 2C:39-4a; third-degree possession of a firearm without a permit, N.J.S.A. 2C:39-5b; third-degree conspiracy to

8

hinder apprehension, N.J.S.A. 2C:5-2; fourth-degree obstructing the administration of law, N.J.S.A. 2C:29-1; and third-degree witness tampering, N.J.S.A. 2C:28-5a.[1]

Prior to trial, defendant moved to suppress conversations intercepted between individuals outside New Jersey. In particular, he sought to exclude conversations that involved himself, a resident of Florida, Dottie, another Florida resident, Myra, a Louisiana resident, and Brenda, who lived in both Florida and Louisiana. Defendant claimed that the orders were "extraterritorial" and that New Jersey officials should have asked the proper authorities in Florida and Louisiana to consent to the wiretaps. Defendant also asserted that the Wiretap Act should be declared unconstitutional because it permits New Jersey authorities to act outside their jurisdiction and wiretap individuals with no connection to New Jersey.

The Honorable Harry G. Carroll, P.J.S.C., denied the motion. He found that the wiretap orders Judge Clark entered were valid and that the Act was not violated by intercepting and monitoring out-of-state communications in New Jersey. Judge Carroll also concluded that the Wiretap Act was constitutional. Among other points, he observed that New Jersey has a

---

[1] The indictment also charged Dottie, Brenda, and Myra with conspiracy, hindering apprehension, and obstruction. Dottie was also charged with witness tampering.

9

substantial interest in the investigation and prosecution of a murder committed within its borders.

Judge Carroll did find that law enforcement officials improperly intercepted one privileged telephone conversation between defendant and his attorney. The trial court noted that the recording "was not done intentionally but rather was inadvertent," and that there was "no evidence" that anyone in the Bergen County Prosecutor's Office listened to the conversation. The court found it "even more troubling" that, although the officer on duty reported the mistaken interception to his supervisors, no one promptly reported the matter to the wiretap judge -- as they should have. In addition, the State disclosed hundreds of recorded calls on eighty compact discs in discovery but did not apprise defendant of the violation -- as it should have.

Judge Carroll suppressed the privileged call, "the entire contents of all intercepted communications obtained thereafter," and "any evidence derived from those intercepted communications." He did not grant defendant's request to dismiss the indictment.

The trial lasted about twenty days that spanned from September 23 through November 6, 2009. As part of the defense case, defendant testified and denied the charges. The jury found him guilty on all counts. After merging various counts,

10

the trial court sentenced defendant on the first-degree murder count to life imprisonment subject to a period of 63.75 years of parole ineligibility. The court imposed a consecutive five-year term for witness tampering, as well as other concurrent sentences.

Defendant appealed and renewed his argument that the Wiretap Act is unconstitutional. In a published opinion, the Appellate Division affirmed his conviction. State v. Ates, 426 N.J. Super. 521, 538 (App. Div. 2012). The appellate panel rejected defendant's argument about the Act's "extraterritorial" reach and noted that the statute "requires a nexus with New Jersey by insisting that, at the very least, the listening post be located in New Jersey." Id. at 533. As the panel observed, "this does not 'usurp [f]ederal authority' because federal law permits the same thing." Ibid.

The panel also rejected defendant's other arguments: that the remedy imposed by Judge Carroll for the unlawful interception of the attorney-client conversation was inadequate; that the prosecutor's remarks during summation about a defense medical expert were improper and prejudiced defendant; that it was prejudicial error to admit in evidence a reenactment of a drive from New Jersey to Louisiana; and that the cumulative effect of the above errors required reversal. Id. at 531, 534-38.

11

We granted defendant's petition for certification. 213 N.J. 389 (2013). We also granted the Attorney General leave to appear as amicus curiae.

                                  II.

Defendant argues that the Wiretap Act is unconstitutional "because it permits New Jersey law enforcemen[t] officials to exceed their jurisdiction and intercept phone calls from out of state individuals who have no connection with New Jersey." As applied to this case, he contends that the Act violates both the federal and state constitutions. He asserts that the law "eradicates all jurisdictional boundaries between the states" and "usurps Federal authority." He also maintains that the statute enables police officers to exceed the jurisdictional and territorial limits on their authority. Defendant contends that just as New Jersey officials are required to enlist the aid of another state to search an out-of-state home, they should seek a wiretap order to monitor phone calls between residents of other states from a judge in those states. Defendant argues that the Act "creates an artificial New Jersey connection" by defining the "point of interception" as the location where the conversation is monitored.

Defendant advances three other arguments as well. First, he claims that the indictment should have been dismissed because law enforcement officials illegally intercepted a conversation

                                   12

he had with his attorney and then failed to report the violation immediately to the wiretap judge.  Second, defendant asserts that the prosecutor improperly commented in summation about the testimony of a defense medical expert, in a manner that denied him a fair trial.  Third, defendant claims that the trial court erred when it admitted evidence that a police officer drove from Ramsey to Sibley, Louisiana in twenty-one hours.  Three years after the murder, a detective drove the route in an effort to prove that the drive could take less than twenty-four hours. (Other evidence showed that defendant was with his mother in Sibley twenty-four hours after the murder.)  Defendant argues that evidence of the reenactment prejudiced him because the State did not notify him of the drive in advance and waited two weeks, until the start of jury selection, to disclose the results.

The State maintains that the Wiretap Act is constitutional and does not confer extraterritorial powers on New Jersey officials.  It argues that the Act defines the point of interception as the location of the listening post, and it asserts that many state and federal courts have upheld similar statutory language.  From a policy standpoint, the State submits that it is preferable to have a single jurisdiction authorize and monitor multiple wiretaps to avoid unnecessarily long periods of interception.

13

The State counters defendant's other arguments as well. It argues that the trial court properly declined to dismiss the case because of the accidental recording of a conversation between defendant and his attorney, which no one in the Bergen County Prosecutor's Office heard. With regard to the prosecutor's summation, the State contends that the record fully supported the prosecutor's comments, that defendant did not object at trial, and that the remarks did not prejudice him. The State also argues that the trial court properly admitted relevant evidence about the amount of time it took a detective to drive from Ramsey to Sibley, Louisiana.

The Attorney General entered this case to defend the constitutionality of the Wiretap Act. The Attorney General maintains that the Act requires a nexus with New Jersey because the listening post must be located here; that the law does not usurp federal authority, which similarly allows for the interception of calls outside the jurisdiction of a court, so long as the calls are acquired or monitored in the court's jurisdiction; and that federal and state courts have repeatedly rejected the same jurisdictional arguments that defendant now raises. In addition, the Attorney General submits that no legitimate privacy interest would be enhanced if officers had to seek wiretap orders from every jurisdiction where a target might

14

be expected to travel.  That approach, the Attorney General asserts, would be unreasonable and unsound.

III.

We begin with defendant's claim that the Wiretap Act is unconstitutional because it allows law enforcement officers to intercept conversations between individuals who are out of the state and have no connection to New Jersey.  At oral argument, defendant claimed that only a judge from the state where an individual resides can authorize a wiretap.  We find no support for defendant's arguments and uphold the constitutionality of the Wiretap Act.

A.

The Fourth Amendment to the United States Constitution and Article I, Paragraph 7 of the New Jersey Constitution guard against unreasonable searches and seizures.  U.S. Const. amend. IV; N.J. Const. art. I, ¶ 7.  Both provisions extend to the interception of phone conversations by law enforcement officials.

In 1967, the United States Supreme Court issued two landmark opinions that addressed electronic surveillance of phone conversations under the Fourth Amendment.  See Berger v. New York, 388 U.S. 41, 87 S. Ct. 1873, 18 L. Ed. 2d 1040 (1967); Katz v. United States, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).  The decisions also outlined certain principles to

15

safeguard individual privacy rights in this area.  Congress responded the following year by enacting Title III of the Omnibus Crime and Safe Streets Act, 18 U.S.C.A. §§ 2510-2520.

Title III established minimum standards for federal and state law enforcement officials to follow when seeking to intercept wire, oral, and electronic communications.  18 U.S.C.A. 2516(2).  In 1968, soon after the law was passed, the New Jersey Legislature enacted the Wiretap Act, N.J.S.A. 2A:156A-1 to -26, and modeled it after Title III.  See In re Wire Commc'n, 76 N.J. 255, 262 (1978); State v. Diaz, 308 N.J. Super. 504, 509-10 (App. Div. 1998) (citations omitted); State v. Sanchez, 149 N.J. Super. 381, 394-97 (App. Div. 1977).

We start our analysis with the Act itself.  The statute makes it unlawful for any person to purposely intercept any wire, electronic, or oral communication.  N.J.S.A. 2A:156A-3a. The law also contains certain exceptions.  It expressly empowers the Attorney General and county prosecutors to apply to a judge for an order authorizing law enforcement officers, who are investigating particular crimes, to intercept wire, electronic, and oral communications.  N.J.S.A. 2A:156A-8.  The Act lists those crimes, which include murder, kidnapping, gambling, robbery, bribery, and other violations of New Jersey's criminal code.  Ibid.  Thus, the Act permits interceptions to investigate certain types of criminal activity in this State.  See State v.

16

Worthy, 141 N.J. 368, 380 (1995); see also N.J.S.A. 2C:1-3a

(providing broad definition of territorial jurisdiction).

A judge must make a number of findings to authorize a

wiretap. In part, the judge must find probable cause to believe

that

> a. The person whose communication is to be
> intercepted is engaging or was engaged over
> a period of time as a part of a continuing
> criminal activity or is committing, has or
> had committed or is about to commit an
> [enumerated] offense . . .;
>
> b. Particular communications concerning
> such offense may be obtained through such
> interception; [and]
>
> c. Normal investigative procedures with
> respect to such offense have been tried and
> have failed or reasonably appear to be
> unlikely to succeed if tried or to be too
> dangerous to employ.
>
> [N.J.S.A. 2A:156A-10a-c.]

The first two findings require a direct link to New Jersey:

that a listed offense -- that is, a particular offense

punishable in New Jersey -- has been, is being, or will be

committed, and that interception may provide evidence of the New

Jersey crime.

An "intercept" is defined in the Act as "the aural or other

acquisition of the contents of any wire, electronic or oral

communication through the use of any electronic, mechanical, or

other device." N.J.S.A. 2A:156A-2c. The Act provides that a

17

wiretap order "may be executed at any point of interception within the jurisdiction of an investigative or law enforcement officer executing the order." N.J.S.A. 2A:156A-12h. Section 2A:156A-2v defines "point of interception" as the site where the "officer is located at the time the interception is made" -- commonly referred to as the "listening post." In other words, a wiretap order signed by a New Jersey judge can empower investigators located in New Jersey to monitor intercepted conversations here, even if both parties to the call are outside the State.

B.

The plain language of the Wiretap Act thus authorizes investigators to intercept out-of-state calls at a listening post in New Jersey. By defining "intercept" to include the "aural acquisition" of a communication, and identifying the "point of interception" as the listening post, investigators at a listening post in New Jersey may intercept and hear phone conversations between individuals located in other states. In the context of this case, the statute permitted the Bergen County Prosecutor to apply for a wiretap order in New Jersey and to execute that order at a point of interception in New Jersey. The question before the Court, then, is whether the Act is constitutional.

18

The Wiretap Act must be strictly construed to safeguard an individual's right to privacy. See Worthy, supra, 141 N.J. at 379-80 (citing State v. Catania, 85 N.J. 418, 437 (1981); State v. Cerbo, 78 N.J. 595, 604 (1979); Wire Commc'n, supra, 76 N.J. at 260). As with any statute, though, we presume the law is constitutional. State v. One 1990 Honda Accord, 154 N.J. 373, 377 (1998) (citations omitted); State v. Muhammad, 145 N.J. 23, 41 (1996). Defendant must shoulder the burden to overcome that strong presumption. See Honda Accord, supra, 154 N.J. at 377 (citation omitted).

Defendant contends that the Wiretap Act unconstitutionally permits New Jersey officials to intercept calls from out-of-state citizens who have no contact with New Jersey. He argues that the Act creates an "artificial connection" to New Jersey with its definition of "point of interception." We do not agree with this description of the law. As discussed above, the Act requires an actual nexus to New Jersey. Before judges can enter a wiretap order, they must find probable cause to believe (1) that a listed, serious offense under New Jersey law has been, is being, or will be committed, and (2) that communications about the criminal activity in New Jersey may be obtained through the interception. N.J.S.A. 2A:156A-10a-b.

The State can only prosecute crimes that occur within its territorial borders. State v. Denofa, 187 N.J. 24, 36 (2006)

19

(citing N.J.S.A. 2C:1-3a(1) ("[A] person may be convicted under the law of this State of an offense committed by his own conduct . . . if . . . [e]ither the conduct which is an element of the offense or the result which is such an element occurs within this State."); State v. McDowney, 49 N.J. 471, 474 (1967)). As a result, the twin findings required under the Act connect the interception of communications to activity in New Jersey. And, of course, the Act requires that the listening post be located "within the jurisdiction" of the law enforcement officer -- that is, within New Jersey. See N.J.S.A. 2A:156A-12h.

In a related argument, defendant claims that the Act is unconstitutional because it eradicates all jurisdictional boundaries and usurps federal authority. We examine this contention to assess if the law violates the federal or state constitution.

Federal case law does not support defendant's position. Because the Wiretap Act is closely modeled after Title III, we give careful consideration to federal decisions interpreting the federal statute. See Wire Commc'n, supra, 76 N.J. at 262; Diaz, supra, 308 N.J. Super. at 510.

Federal circuit courts have consistently upheld wiretaps based on the location of the listening post, and no circuit court has found Title III unconstitutional on that ground. The Second Circuit, for example, addressed the issue in United

20

States v. Rodriguez, 968 F.2d 130 (2d Cir.) (interpreting 18 U.S.C.A. § 2518(3)), cert. denied, 506 U.S. 847, 113 S. Ct. 139, 121 L. Ed. 2d 92 (1992). In that case, government agents suspected that individuals sold crack in New York City and stored the cash proceeds at a restaurant in New Jersey. Id. at 133-34. Pursuant to an order authorized by a federal judge in New York, the investigators wiretapped four telephones at the restaurant. Id. at 134.

The defendants challenged the wiretaps on the ground that the district court in New York did not have jurisdiction to authorize wiretaps of New Jersey phones. Ibid. The Second Circuit rejected the argument and upheld the wiretaps. Id. at 133. The panel found that the place of interception could be at either of two locations: where the tapped phone was located (in New Jersey), or where the police first monitored or listened to the communication (in New York). Id. at 136. As to the latter, the panel explained that Title III defines interception as the "aural" acquisition of the contents of the call, and because "aural," by definition, "'pertain[s] to the ear or the sense of hearing,'" the interception also occurs where the call is first heard. Ibid. (citation omitted).

The court in Rodriguez also found that its approach helped protect individual privacy rights:

21

> [W]here the authorities seek to tap telephones in more than one jurisdiction and to monitor them in a single jurisdiction, there are sound policy reasons for permitting a court in the jurisdiction where all of the captured conversations are to be heard to grant the authorization. One of the key goals of Title III is the protection of individual privacy interests from abuse by law enforcement authorities. For example, Title III requires that a wiretap authorization not allow the period of interception to be "longer than is necessary to achieve the objective of the authorization." If all of the authorizations are sought from the same court, there is a better chance that unnecessary or unnecessarily long interceptions will be avoided.

[Ibid. (citations omitted).]

Other federal courts have followed Rodriguez and held that judges can authorize wiretaps when the listening post -- and thus the interception -- is within the court's jurisdiction, even if the phone is located elsewhere. See United States v. Luong, 471 F.3d 1107, 1109-10 (9th Cir. 2006) (finding that court in Northern District of California, where listening post was located, had authority to issue wiretap order for mobile phone subscribed to billing address in Eastern District), cert. denied, 552 U.S. 1009, 128 S. Ct. 531, 169 L. Ed. 2d 371 (2007); United States v. Denman, 100 F.3d 399, 403-04 (5th Cir. 1996) (finding that court in Eastern District of Texas, where listening post was located, had authority to issue wiretap order for telephones located in Southern District), cert. denied, 520

22

U.S. 1121, 117 S. Ct. 1256, 137 L. Ed. 2d 336 (1997); United States v. Giampa, 904 F. Supp. 235, 278 (D.N.J. 1995) (finding that federal judge in New Jersey, where listening post was located, had authority to issue wiretap order for telephone in Southern District of New York), aff'd, 107 F.3d 9 (3d Cir. 1997); United States v. Burford, 755 F. Supp. 607, 610 (S.D.N.Y. 1991) (rejecting constitutional and statutory challenges and finding that federal judge in New York, where listening post was located, had authority to issue wiretap order for telephone in Maryland), aff'd, 986 F.2d 501 (2d Cir. 1992); see also United States v. Ramirez, 112 F.3d 849, 852-53 (7th Cir.) (finding interception of cell phone valid under federal law regardless of where phone or listening post is located), cert. denied, 522 U.S. 892, 118 S. Ct. 232, 139 L. Ed. 2d 163 (1997).

State courts have taken a similar approach. In Davis v. State, 43 A.3d 1044, 1055 (Md. 2012), Maryland's highest court upheld a wiretap order issued by a Maryland judge for a cell phone registered to a Virginia address. During the period of interception, the phone was in Virginia, but detectives monitored calls from Maryland. Id. at 1050. Relying on the language and history of the Maryland statute as well as federal case law interpreting Title III, the Davis court held that "interception" of a communication "occurs where law enforcement officers capture or redirect . . . the contents of the

communication" and "originally" hear it. Id. at 1048. If the listening post is located within the wiretap court's territorial jurisdiction, then "neither the physical location of the mobile phone at the time the call was placed" nor "the recipient of the call are material." Ibid. The Maryland court also noted that a different outcome would present "an enormous logistical and technological challenge to law enforcement" officials if an investigation involved a cell phone that crossed state lines. Id. at 1054.

The majority of courts that have interpreted state wiretap laws agree. See United States v. Tavarez, 40 F.3d 1136, 1138 (10th Cir. 1994) (interpreting Oklahoma law to allow district attorney for Judicial District 21, where listening post was located, to apply for wiretap order for telephones in District 19); State v. McCormick, 719 So. 2d 1220, 1223 (Fla. App. 1998) (finding that Melbourne police officer had authority under Florida law to seek wiretap order for cell phone subscribed to resident of Merritt Island because listening post was in Melbourne), review denied sub nom. Mitchell v. State, 732 So. 2d 327 (Fla. 1999); see also Luangkhot v. State, 736 S.E.2d 397, 427 (Ga. 2013) (holding that judges have authority under state law to issue wiretap warrants if tapped phone or listening post is located in judicial circuit); but see Castillo v. State, 810 S.W.2d 180, 184 (Tex. Crim. App. 1990) (holding under Texas law

24

that interception occurs where wiretap device, not listening post, is located).  Aside from the Appellate Division's ruling in this case, there do not appear to be any reported decisions in New Jersey which directly address defendant's argument.

In support of his constitutional claim, defendant draws an analogy to the search of a home.  He contends that because law enforcement officers must seek a search warrant from a judge in the state where a residence is located, they should be required to follow the same approach to intercept phone calls between out-of-state parties.  In this case, he argues that only a judge in Florida or Louisiana could authorize officers to intercept calls in those states.

There are obvious differences between searching a fixed location, like a home, and intercepting a phone call on a mobile phone.  As the court in Burford noted, "[s]earch warrants are issued to permit seizure of tangible physical evidence which is, by definition, in only one location.  Wiretaps, in contrast, involve seizure of transitory intangible evidence."  Burford, supra, 755 F. Supp. at 611.

That distinction presents real, practical concerns.  If out-of-state intercepts could only be authorized by a judge in the jurisdiction where the phones are located, how could officers lawfully intercept cell phone calls?  Suppose a judge in one state issued a wiretap order, and the cell phone user

25

crossed the state's border. Would another warrant, signed by a judge in the neighboring state, be needed? See Davis, supra, 43 A.3d at 1054. Would law enforcement officers be expected to obtain multiple warrants for the same phone in advance? How would they know where a target might travel and where a call would be made from or received? The inherent mobility of the modern cell phone could defeat even the most responsible efforts to monitor it. In short, defendant's reading of the Act would make it impractical to intercept cell phone conversations. Viewed in that light, the Act's definition of "point of interception" -- the site where an officer is located when an interception is made, N.J.S.A. 2A:156A-2v -- makes rational sense.

At the heart of defendant's argument is the notion that his constitutional right to privacy entitles him to have a judge in the state where he resides, Florida, sign a wiretap order for his cell phone, rather than a judge in New Jersey, where the wiretap order is executed. But defendant does not provide any factual or legal basis to explain why his privacy rights were violated when a New Jersey judge reviewed a wiretap application for his phone.

The decisions discussed above correctly concluded that courts in different states -- where the phone is located and where it is first monitored -- can issue a wiretap order. See,

26

e.g., Rodriguez, supra, 968 F.2d at 136. Judges in both states would have to ensure that the prosecutor provided an adequate basis for an order. At a minimum, the application would have to meet the requirements of Title III. See 18 U.S.C.A. § 2516(2); United States v. Marion, 535 F.2d 697, 702 n.9 (2d Cir. 1976); Commonwealth v. Vitello, 327 N.E.2d 819, 833-34 (Mass. 1975) (citations omitted). In other words, judges in both states would have to make the necessary probable-cause findings designed to protect an individual's privacy rights. See Worthy, supra, 141 N.J. at 379-80 (citations omitted). In New Jersey, Florida, or Louisiana, which all have a connection to the intercepted communications in this case, defendant's Fourth Amendment rights would be protected.

We agree with the many federal and state courts that have allowed judges in the state where the listening post is located to authorize a wiretap. We conclude that the Wiretap Act is constitutional under both the federal and state constitutions.

IV.

Defendant raises several other challenges as well. He claims that the trial court's remedy for the unlawful, albeit inadvertent, interception of a privileged communication was inadequate; that the prosecutor's summation was improper; and that the court erred by admitting evidence of a reenactment of a drive from New Jersey to Louisiana. As to each of those points,

27

we affirm substantially for the reasons stated in Judge Fisher's thoughtful opinion.  Ates, supra, 426 N.J. Super. at 534-38.

V.

For the reasons stated above, we affirm the judgment of the Appellate Division.

JUSTICES LaVECCHIA, ALBIN, PATTERSON, and FERNANDEZ-VINA and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in CHIEF JUSTICE RABNER's opinion.

SUPREME COURT OF NEW JERSEY

NO. ___A-52___                    SEPTEMBER TERM 2012

ON CERTIFICATION TO ___Appellate Division, Superior Court___


STATE OF NEW JERSEY,

      Plaintiff-Respondent,

          v.

EDWARD RONALD ATES a/k/a RON
WAVERLY,

      Defendant-Appellant.


DECIDED      ___March 18, 2014___
      ___Chief Justice Rabner___   PRESIDING

OPINION BY   ___Chief Justice Rabner___

CONCURRING/DISSENTING OPINIONS BY _____

DISSENTING OPINION BY _____

| CHECKLIST | AFFIRM | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |